Thank you, Your Honor. Thank you, Your Honors. The court will hear argument now in the case of United States v. Wallace. Mr. Maliza. Thank you, Your Honor. May it please the court and Ms. Boyle. Your Honor, I would start with the Rule 49 motion in this case about the in large part, we rest on our written pleadings. But I would like to point the court's attention specifically to Judge Hamilton's comment in the 2019 Garcia case, that if one starts from a presumption of guilt, the context of the of the evidence allows impermissible speculation to look like permissible inference. In this case, the presumption of guilt was there from the start. As noted in our reply brief, it's not entirely clear that a crime was actually committed. There was a gun found in a neighbor's gutter. Um, that really colors the entire presumption that the jury used here in making the speculative leaps, trying to fill the voids of evidence, specifically, the lack of forensic evidence like DNA, or fingerprints, the fact that Officer Christensen testified that one cannot see a gun on the video, the fact that Officer Christensen fully admitted this was in their opening statement to have made mistakes that very evening in his memory. And as noted in the Harris case in this court, a conviction cannot simply be the piling of inference upon inference, there has to be at least a solid base of clear links that does not require the jury to fill the void. Unless the court has any questions on that Rule 29 issue, I'd like to move to the two sentencing issues regarding criminal history points and the offense level. That being the case, Mr. Wallace should have been in criminal history category four, and I would start out by noting that our brief incorrectly stated that he shouldn't have gotten any points for the 2014 fleeing and eluding case. He should have gotten one point instead of two, and that one point still would have taken him down to criminal history category four, so I apologize for that oversight, Your Honor. Having just seen the government's additional authority this morning, my review of it, first of all, is that it highlights the fact that the government waived this argument in the district court. Specifically, during the sentencing hearing, the government argued that the applicable law was that only the announced sentence matters, and for that reason, it doesn't matter what case Mr. Wallace actually served time on in the 2014 or 2015 fleeing, eluding versus domestic case. Now, the reason that really plays a big role here is that that argument from the government induced the district court to forego a decision on which case Mr. Wallace actually served on. Essentially, in the Staples case, it's clear that Mr. Staples was serving two sentences. He specifically served time on two sentences, so the time was going to be allocated to both cases no matter what. In this circumstance, there are two cases, one of which was dismissed, and the question is, was the time actually served on the dismissed case, or was it actually served on the case for which he pled guilty? Now, the thing about that, and the Buter case talks about it well, is that there was no actual negative consequence for Mr. Wallace from the case he pled on, from the fleeing and eluding. He was arrested on September 8th, 2014, I believe. He bonded out on that case. On August 18th, 2018, the bond in that docket, in that Champaign County court, said your bond continues. So, he was never revoked on that case, and the next time he showed up in court to talk to the judge, they said, go home. So, as far as that case goes, our argument was at the district court, and is here, that the sentence cannot be allocated to him because there was no actual time served. The application is very clear, and it has a condition present to assigning any points, which is a sentence was actually served. The other issue, whether the sentence was fully suspended or not, that determines how long the sentence was and how we would say that the government waived all argument about Staples, and that waiver induced the district court not to settle the dispute as required by Rule 32 I3B. And so, that we believe is a procedural error that warrants remand in any event, because the court, this court can't review whether or not the district court had that question correct because there was no decision made. Now, at the end of the hearing, the district, the government asked whether the judge's sentence would have been the same. He said, oh, I'm sure it would have been. And I challenged him. I said, your honor, well, what if you had ruled on this sentence or that issue, this objection? And he said, I took it into account. Now, the problem is, and the reason that none of these errors are harmless, is that the amount that these things were taken into account is completely opaque. As noted in our brief, if all of our objections were granted, it would have been a 236% increase over the high end of the guidelines. And as this court has said several times, where you fall in the guidelines, higher or lower, it needs to be fully explained. And absent the necessary rulings on the objections, and then with the somewhat vague reference to take it into account, Mr. Wallace is unable to understand why his sentence was where it was. I would move next to the issue of whether or not his 2003 conviction in Champaign-Franklin was a controlled substance offense under the guidelines. Now, we understand that the United We do not wish to waive our argument, however, and I would just note that we still believe that on that score, on the guidelines issue, Ruth should have followed the Townsend line of cases from the 2nd, 5th, 8th, and 9th circuits, instead of striking out on its own with the natural meaning test. So without waiving that argument, we do still believe that it's not a controlled substance offense under the definition, the natural meaning definition. Well, you're asking to ignore our decision. I'm asking the court to revisit that decision in light of the fact that the 4th Circuit, just a few weeks towards in United States v. Ward, did necessarily follow it. But I understand the court's not like to revisit Ruth at this point, which is why I'm arguing at this point, Your Honor, that we still win under Ruth. And the reason why is that Ruth said in natural meaning, and the natural meaning is that a controlled substance must be behavior-altering. Those are the specific words. Now, the United States has argued, and the court can take judicial notice of this, in the Central District of Illinois, case number 19-20035, United States has argued that positional isomers of cocaine, the very thing making Mr. Wallace's conviction overbroad, are not psychoactive. They attached a chemist's report saying as much. They have made that argument very explicitly in their own brief. Now, psychoactivity is just a fancy way of saying behavior-altering. So, the very substance that makes Mr. Wallace's conviction broader than the federal definition is the same substance that makes it broader than the conduct described in Section 4B, 1.2B. That is, Mr. Wallace's conviction, however you slice it, divisible, indivisible, it all comes back to this overbred from positional isomers of cocaine. It involves a substance that is not behavior-altering. If that's the definition, and if we are applying the categorical approach, there is no way to say that he necessarily, that conviction necessarily entailed selling a behavior-altering drug. Indeed, the non-psychoactivity of it is likely the reason that Congress did not include it in the Control of Substances Act. So, for that reason, we think we still win under Ruth, even as it is, Your Honor. Last, I would note that the government asserted in its brief that Mr. Wallace actually waived the entire argument about criminal history points on that 2014 case. We would note, as we stated, the objection was made. At the beginning of the sentencing hearing, I offered an alternative avenue of relief. The judge insisted on us arguing. So, the objection was raised. Argument was made from both sides. The judge pushed back on some issues, and there was a ruling that noted a waiver implies an intentional relinquishment of a known right. Mr. Ruth did not relinquish that right by choice. He relinquished it because the judge ruled against us. Unless the Court has any questions, I'll reserve the rest for rebuttal. Certainly, Counsel. Ms. Boyle. Good morning, Your Honors. May it please the Court, Counsel, my name is Catherine Boyle on behalf of the United States. Mr. Wallace's challenge is here to the sufficiency of the evidence, which Mr. Wallace addressed first as well. A rational trier of fact could have found that the evidence at Mr. Wallace's trial was sufficient to find him guilty of possession of a firearm by a felon. There's ample evidence in the record showing Mr. Wallace's guilt. Mr. Wallace's knowing possession of the handgun was the only issue, was the only element of his felon in possession offense at issue at trial. The government established that element. The government introduced evidence regarding, first of all, the suspicious circumstances that sort of triggered their encounter with Mr. Wallace. There was a late night 911 call, an apparent altercation at Ms. Cross's residence, and there was also obfuscation by Ms. Cross that the officers noticed to start off. Even more compellingly, Officer Christensen testified that Mr. Wallace had pointed a silver handgun at him and provided an accurate description of Mr. Wallace and that gun, both at the time of the offense and in court. Importantly here, just to show why Officer Christensen was so tuned into what Mr. Wallace had in his hands, Mr. Officer Christensen pointed out at the trial that he always pays particular attention to an individual's hands when he looks at them because the hands are what can hold a weapon. The hands are what could kill him. He was immediately trained in on that part of the encounter. Additionally, the government introduced video evidence corroborating Officer Christensen's story. The government further presented evidence regarding an eastward chase of Mr. Wallace from 610 Goldenview to 609 Castleton to 612 Castleton where he was discovered. There was evidence of his flight path, including a rattling fence and a motion detector light, which led to his discovery. And when he was spotted, when that light went on, he was out of breath and sweaty. A silver handgun matching the description provided by Officer Christensen was then found in the gutter of the house at 612 Castleton, which is exactly where Mr. Wallace himself was found as well. And the government also presented evidence that Mr. Wallace was very concerned about why officers were looking in the area and told them that there would be absolutely nothing to find there. Mr. Wallace has argued that Officer Christensen's initial misapprehension that he had announced himself as police prior to diving for cover and seeing Mr. Wallace with the gun doesn't really change the truth or the substance of his testimony. It doesn't discredit its accuracy. This was a high-octane encounter where Officer Christensen had a gun pointed at him. A slight discrepancy in sequence of events should not undermine whether or not he knew that he saw a handgun pointed at him. So the evidence in this case we believe was more than sufficient to find Mr. Wallace guilty. Although we do believe Mr. Wallace has arguably waived his challenge to the technical accuracy of his criminal history score based on some of counsel's comments, we actually don't think that that's determinative of the issue anyway. Even if Mr. Wallace didn't waive his challenge to his score, the district court properly determined that his 2014 conviction for fleeing police merited two criminal history points under section 4A.1.1b of the sentencing guidelines. Under that guideline, a prior sentence of imprisonment that is at least 60 days but equal to or less than one year and one month merits two criminal history points. The guidelines have focused on the sentence imposed but we do recognize that there is a requirement that the defendant have actually served some time on a sentence. However, we believe this court's decisions in Staples and Atkinson are instructive. Mr. Wallace received credit for time he had actually served in his dismissed domestic battery case on the fleeing alluding case. As such, Mr. Wallace had actually served time on that sentence. And the situation in Staples is almost completely analogous. It discusses the same application note. We have a defendant who received a 250-day sentence for the prior conviction at issue. He received credit of 250 days in relation for an unrelated probation violation. And this court noted there's an and credit for time served. A defendant who receives a suspended sentence may never have never served any time in jail. Whereas a defendant who receives credit for time served has actually served time on the sentence. And Atkinson is a similar posture as well. It's a defendant who had served 77 days prior to the imposition of sentence and then received credit for that 77 days in his subsequent sentence. And we don't believe the government. I know that argument moments ago, Mr. Wallace argues that the government has waived that argument. In district court, the government noted that Mr. Wallace had received a 136-day sentence and spent significant time going into the details of why Mr. Wallace had actually served 136 days. So we don't believe that argument was waived. As your honors have noted, we believe that the controlled substance offense and the guidelines enhancement under 2K2.1 is resolved by the court's decision in Ruth. As a court held in Ruth, the term controlled substance in section 4B1.2 should be given its plain meaning. Any type of drug whose possession and use is regulated by the law. Given that natural meaning, his cocaine trafficking conviction is a controlled substance offense under the definition in the career offender guidelines and therefore also under 2K2.1, which cross-references it. And then finally, should this court determine in any way that the, that there was a guidelines calculation error, any error was harmless because the district court indicated it would have imposed the same sentence regardless of its rulings and Mr. Wallace's objections. The district court engaged in a thoughtful 3553A based analysis, noting some of Mr. Wallace's personal characteristics, but also the danger of the encounter. The government asked the court if it would have imposed the same sentence if it found in favor of the defendant's objections on the guidelines. And the court said it would. Particularly interesting, the court imposed a 78-month sentence. A 78-month sentence reflects a guideline range which discounts those two criminal history points. Had Mr. Wallace not received the additional point, he would have, his guidelines range would have been 63 to 78 months. The court, clearly based on the danger involved in pointing a gun at a police officer, opted to give him a sentence at the high end of that range. And the court also explained that although it had denied the controlled substance objection, it had very much considered that objection in sentencing. However, we believe that that objection wasn't valid anyways in light of this court's decision in Ruth. If there are no questions, I'll rest on the arguments in our briefs. Thank you, Your Honors. And ask that the court affirm. Thank you. Thank you, Ms. Boyle. I have one question. We had a blank here for a while where I didn't see it, but it was the pointing of the gun that I wanted to just clarify that the officer who the gun was pointed at, that's the only actual physical evidence of the gun being connected to your client. Is that right? Well, Your Honor, I'm representing the government, but the, we believe that- Sorry, I meant your client, not the government. Thank you, Your Honor. As far as evidence, it's of the possession of the gun is when it was pointed at the officer and he identified it as a gun. Is that right? I'm sorry, there was a blank in the communication here for space, three or four minutes, unfortunately. I understand, Your Honor. The Zoom arguments are challenging for all of us. We believe that there is more evidence than that. So first of all, you have Officer Christensen testimony that Mr. Wallace pointed a handgun at him, as you note, but we also have corroborating video where Mr. Wallace can be very clearly, relatively clearly seen squaring his shoulders and pointing his hands directly out in front of them as though squaring off with a handgun. And we think the corroborating evidence in terms of Officer Christensen diving for cover and immediately announcing that the suspect had a gun further backs up what he saw and what is reflected in that video, as well as Mr. Wallace's subsequent flight and the discovery of the gun in the very roof gutter of the house where he was found sweaty and out of breath moments later. And I should note also that the silver handgun described by Officer Christensen, as well as Mr. Wallace's clothes match the silver handgun found in the roof gutter and match the clothes that Mr. Wallace was wearing and the description Officer Christensen had provided as well as the video. Did you actually see him throw the gun on the roof where they got caught? Something like that? I don't believe anybody saw him throw the gun on the roof, Your Honor. Well, you had to get up there somehow. We believe he threw the gun on the roof. That's what we surmise. But the motion detector light came on, I believe, probably shortly after he had thrown it. Okay. Thank you, Your Honor. Okay. Now, thank you very much, Ms. Boyle. Anything further, Mr. Melisa? Yes, Your Honor. Thank you. And this actually gets to Judge Mannion's questions. Was there anything actually tying Mr. Wallace to that gun? The video, as Officer Christensen testified, doesn't show a gun. It shows a person, as Ms. Boyle put it, raising his hand. Now, that's entirely consistent with a person getting a light shown in their eyes in the dead of night. And it's shown directly in your eyes as police officer lights are very powerful. And he raised his hand to block it and see where the light was coming from. As this court has said in the Harris case, when the evidence speaks to both guilt and innocence, one cannot get guilt without impermissible speculation. You also asked on whether or not someone saw him throwing the gun on the roof. And it's interesting because the police officers had conflicting testimony about that. Officer Lee testified that he had thrown it up and over the house from the driveway to the back side of the apartment. And he testified that he had thrown it from the backyard. Officer Pescevento said, hey, this doesn't make much sense. And nobody testified to having heard a gun hit the roof. They talked about the fence. I identified three or four, or I think it was three different fences. But they all testified that they did not hear a gun hit a roof. And this... There was a silver gun in the gutter, a kind of unusual situation, don't you find, counsel? Certainly, your honor. And I think that that's the... Ms. Boyle referenced Mr. Wallace's concern with the dragnet over the neighborhood, saying, I don't know what my neighbors are up to, and you're going to put something on me. And the officer who was holding him at the time said, well, we're looking for what there is to put on you. And so that's why... And this was the testimony that was played in the video before the jury. The issue is really whether there was impermissible speculation. Suspicion, every single case where a Rule 29 motion has been granted or upheld or reversed in terms of acquittal, every single case this court has looked at has said, we understand the suspicion. We understand the tendency to nod along with the government's evidence. But suspicion is not enough. And as you put it, Judge Kennedy, when we've got a gun in a roof, in a gutter, that's a weird situation. It's suspicious. But as Officer Pasovento testified, it doesn't make sense that the guy didn't run away. If he had known it, why would you stand there right underneath the gun or right at the house where the gun was? The last issue with regard to the two criminal history points versus one is the government says it was properly determined, but the actual dispute, which sentence were these 136 days actually served on? The argument in the district court from us was that it was a typo, that he didn't actually serve that time, and that the state court judge had just kind of misapprehended what he was serving time on. That dispute was never settled. It was never settled because, and I'm reading from the transcript, I would note as well that the criminal history computation in the guidelines is based on the sentence imposed, not the actual time served. That was the government's argument. So the government used the district court not to rule on the actual dispute as required by Rule 32B. Last, just reiterating, the fact that the judge said, yes, I would have made the same sentence, that then transforms into a whole new problem of not having explained why his sentence was so high or low or where it fell in the guidelines. And I see that my time is up. Unless the court has any questions, I have nothing further. Thank you very much, counsel. The case is taken under advisory.